**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. _____

MARSH USA INC., a Delaware corporation,

      Plaintiff,

v.

Cobbs Allen Capital, LLC, a Delaware limited liability company,

      Defendant.

---

## COMPLAINT

---

Plaintiff Marsh USA Inc. ("Marsh") brings this Complaint against Defendant Cobbs Allen Capital, LLC.

### NATURE OF THE ACTION

1. Defendant has engaged in a wrongful scheme to disrupt Marsh's business by hiring approximately 30 of Marsh's employees, encouraging and inducing them to leave Marsh and take Marsh's trade secrets, clients, and employees with them, and assisting these employees in recruiting each other to leave Marsh in violation of their restrictive covenant agreements and in violation of their duties of loyalty/fiduciary duties. Based on similar litigation pending against Defendant, and prior suits against Defendant, it appears that Defendant has a pattern and practice of conducting similar schemes against its competitors. Accordingly, Marsh brings this action for (1) violation of the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*); (2) violation of Colorado's Uniform Trade Secrets Act; (3) interference with contractual relations; and (4) aiding

and abetting breaches of the duty of loyalty and fiduciary obligations. Plaintiff Marsh seeks injunctive relief, damages, and all other appropriate relief to stop Defendant's wrongful actions.

## PARTIES, VENUE, AND JURISDICTION

2.     Plaintiff Marsh is a Delaware corporation with headquarters in New York, New York.

3.     On September 1, 2019, the legal entity JLT Specialty Insurance Services Inc. ("JLT Specialty USA") merged into Marsh USA Inc. As of that date, Marsh owned—and continues to own—all the assets of JLT Specialty USA.

4.     Cobbs Allen Capital, LLC ("Cobbs Allen Capital") is a Delaware limited liability company. Its principal place of business is Alabama.

5.     Beginning in or about April 2019, a large number of employees left Marsh to join CAC Specialty. Based on testimony in a pending matter in Alabama (Northern District of Alabama Case No. 2:19-cv-01196-ACA), these departures were coordinated by an entity called CAC Specialty. The employees were encouraged to solicit each other at a meeting sponsored by CAC Specialty in Denver, Colorado.

6.     Although CAC Specialty has its own website (https://cacspecialty.com/) and represents that it employs the former Marsh employees, Marsh has been unable to locate records of CAC Specialty's formation documents or registration as of August 12, 2019 in Colorado, Delaware, Georgia, Illinois, New York, California, or Alabama. Upon information and belief, CAC Specialty is a d/b/a of Cobbs Allen Capital. Marsh will refer to Cobbs Allen Capital as CAC Specialty. If it becomes known that CAC Specialty is an actual separate entity, Marsh will move to amend its complaint.

7.      As discussed below, and based on a review of electronically stored information, Marsh is informed and believes that at least some employees took Marsh information with them before leaving, with the goal of using that information to take Marsh's clients away from Marsh and to CAC Specialty, and disrupting Marsh's ability to service client accounts.

8.      This Court has original jurisdiction over this matter pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836(c), and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within this district. Many of the former Marsh employees at issue worked in Denver, Colorado, were working in Denver at all relevant times, and were encouraged to solicit each other at a meeting sponsored by CAC Specialty in Denver, Colorado.

## FACTUAL BACKGROUND

### Marsh and Its Business

10.      Founded in 1871, Marsh is a global leader in insurance broking and risk management.

11.      In recent years, Marsh has made great efforts to expand its presence in certain aspects of the middle market and certain small commercial segments of the insurance market. As part of that effort, in April 2019 Marsh's parent company, Marsh & McLennan Companies, Inc., acquired Jardine Lloyd Thompson Group plc, and thereafter combined JLT Specialty USA, a Denver-based insurance company, with Marsh. As part of that transaction, JLT Specialty USA

employees were offered positions with Marsh that were generally equivalent to their positions with JLT Specialty USA, or better. Most did in fact transition to Marsh.

12.     Marsh's proprietary information is critical to its operations, and Marsh takes appropriate measures to protect it. For example, Marsh's employees generally sign confidentiality agreements containing provisions that prohibit them from using or disclosing Marsh's confidential information or trade secrets during or after their employment with Marsh. The agreements also require employees to return Marsh's information at the end of their employment. Marsh employees are also required to sign non-solicitation agreements containing narrowly tailored restrictions on soliciting certain of Marsh's clients, prospective clients, or employees.

13.     JLT Specialty USA required its employees to sign agreements containing similar restrictions. Marsh is the successor to those agreements.

14.     JLT Specialty USA's former CEO, Michael Rice, signed an Employment Agreement with JLT Specialty USA dated August 28, 2014 ("Agreement"). Marsh is the successor to the Agreement. The Agreement prohibited Rice from entering into any business relationship of the same type or kind that existed between him and JLT Specialty USA and its clients or customers, as defined by the Agreement, to provide services related to the business for any individual, partnership, corporation, association, or other entity on whose account he worked or became familiar during the 24-month period prior to his Termination Date, July 31, 2019. The Agreement further provides that Mr. Rice is prohibited from soliciting restricted employees during that same period (which expires on February 28, 2021).

15.     Mr. Rice also executed a Separation Agreement with JLT Specialty USA dated April 26, 2019. The Separation Agreement affirmed and reiterated Mr. Rice's obligation's not to use or

disclose confidential or trade-secret information after his employment ended, and affirmed and reiterated the restrictive covenants in his Agreement.

### Marsh's Confidential Business Information and Trade Secrets

16.     As part of its business, Marsh has developed and maintains trade secrets and other confidential information. Similarly, Jardine Lloyd Thompson Group plc developed and maintained trade secrets and other confidential information prior to its acquisition by Marsh & McLennan Companies, Inc. Marsh owns this information as a result of its parent company's acquisition of Jardine Lloyd Thompson Group plc and the legal-entity integration of JLT Specialty USA into Marsh.

17.     For example, Marsh owns information concerning its clients and prospective clients, including contact information and confidential and proprietary strategies and analysis regarding decision makers at those clients/prospective clients.

18.     As a specialty broker, JLT Specialty USA negotiated unique insurance contracts with unique pricing, structures, and provisions. The structuring of these insurance contracts involves a marriage of information concerning the clients' businesses, the customers' preferences, and the insurers' willingness to structure insurance policies that match the clients' needs. Importantly, it also involves understanding the types of insurance solutions that might work, but that the clients do not prefer, or solutions that the clients prefer but the insurers to not. This information was developed by the employees who have joined CAC Specialty, while they were at JLT Specialty USA and on JLT Specialty USA's behalf, and it is now owned by Marsh as a result of its parent company's acquisition of Jardine Lloyd Thompson Group plc and the legal-entity integration of JLT Specialty USA into Marsh.

19. The employees who have left to join CAC Specialty are now using the information that they developed for JLT Specialty USA and that is now owned by Marsh to solicit and take Marsh's clients to CAC Specialty on CAC Specialty's behalf and with CAC Specialty's support and knowledge.

20. The fact that CAC Specialty is supporting these efforts and knows that information belonging to Marsh is being used by the former JLT Specialty USA employees is a result of the fact that many of the employees are senior executives at CAC Specialty, and their knowledge of what they themselves are doing, as well as their knowledge of what their peers are doing, is attributable to CAC Specialty.

21. The information discussed above was developed by Marsh and JLT Specialty USA over many years and at considerable expense. The information is not generally known in the industry and would be of immense value to Marsh's competitors. It allows CAC Specialty to unfairly compete against Marsh and damage Marsh's client relationships.

22. Before the acquisition, JLT Specialty USA maintained secure, password-protected systems. JLT Specialty USA's employees had access to this information as part of their duties, but they had to access it through JLT Specialty USA's secured systems, and the information was not to be shared outside of JLT Specialty USA.

23. Marsh maintains secure, password-protected systems. Marsh's employees have access to this information as part of their duties, but they must access it through Marsh's secured systems, and the information is not to be shared outside of Marsh.

**Marsh's Efforts to Protect Its Trade Secrets and Other Confidential Information**

24.     Because its trade secrets and confidential information are valuable and critical to Marsh's business, Marsh takes substantial measures to protect the secrecy of this information.

25.     As set forth above, Marsh and JLT Specialty USA require and required their employees to sign agreements containing non-disclosure provisions. Those provisions prohibit Marsh's and JLT Specialty USA's employees from using or disclosing trade-secret and other confidential information except for legitimate business reasons. Those obligations continue even after their employment ends. The agreements further require the employees to return all confidential company information in their possession at the end of their employment, and prohibit them from improperly recruiting certain employees and soliciting or servicing certain clients.

26.     Similarly, Marsh and JLT Specialty USA ask and asked their employees to sign separation agreements affirming these obligations when their employment ends.

27.     Marsh and JLT Specialty USA also created policies governing company information and use of company resources such as computers and other devices, including the JLT USA Employee Handbook and Marsh compliance policies regarding Handling Information Appropriately and Acceptable Use of Information Assets.

28.     Marsh's computer systems are secured and password protected. Marsh's employees who use these systems must access them with unique passwords and on company devices. Marsh employs IT security professionals who monitor Marsh's systems.

29.     Marsh's premises are also secured by keycard entry requirements and building security guards.

**CAC Specialty's Misconduct**

30.     CAC Specialty has engaged in a systematic campaign to organize a mass exodus of employees from Marsh to CAC Specialty in an effort to disrupt Marsh's business relationships. In doing so, CAC Specialty has not merely sought to hire these employees, but has encouraged and provided assistance to these employees to breach their contractual obligations with Marsh, as outlined above, and to take Marsh's trade secrets and confidential information with them to CAC Specialty.

31.     CAC Specialty has an apparent pattern and practice of engaging in such schemes against its competitors. For example, McGriff Seibels & Williams, Inc. ("McGriff"), an Alabama-based insurance company, has filed a lawsuit against CAC Specialty alleging many of the very same improper acts alleged in this Complaint, including that CAC Specialty misappropriated McGriff's trade secrets and interfered with McGriff's employment agreements.

32.     In the course of the McGriff lawsuit in Alabama, CAC Specialty admitted through sworn testimony that it arranged a meeting in Denver in June 2019, with CAC Specialty paying the airfare and lodging, whereby JLT Specialty USA employees and McGriff employees would meet with each other for the purpose of getting "key leaders from both groups to meet each other, with the hope that they would build some momentum that they would eventually want to join with us [CAC Specialty]."

33.     CAC Specialty intentionally arranged what Bruce Denson, the head of CAC Specialty's ultimate parent corporation, referred to in the McGriff litigation as a "comical" series of meetings between the JLT Specialty USA employees and McGriff employees, described by another witness in that litigation as "speed dating."

34.     Given that the express purpose of the meeting was to "build momentum that they would eventually want to join" CAC Specialty, and given that certain JLT Specialty USA employees did in fact join CAC Specialty, it is reasonable to infer that these JLT Specialty USA employees did in fact encourage each other to leave JLT Specialty USA and Marsh and join CAC Specialty in violation of their agreements not to recruit each other and in violation of their duties of loyalty/fiduciary obligations.

35.     In the past few months, CAC Specialty has hired approximately 30 JLT Specialty USA and Marsh employees, with many resigning on the same day or within days of each other. A review of these employees' communications and their computers reveals that many of these employees were in close contact with each other and McGriff about these departures, and planned them to maximize potential disruption to Marsh's business.

36.     CAC Specialty has interfered with Marsh's agreements by encouraging and assisting Marsh's employees to violate the non-competition, non-solicitation, and non-servicing provisions of those agreements.

37.     CAC Specialty has also permitted Marsh's former employees to bring Marsh's confidential and trade secret information with them to CAC Specialty, interfering with these employees' agreements not to use or disclose Marsh's confidential and proprietary information.

38.     Forensic analysis of the departing employees' computers has revealed that many of these employees engaged in similar misuse of Marsh's computer systems in the days leading up to their departures. This misconduct includes numerous employees accessing key Marsh files just before their departures, the use of USB devices to apparently transfer Marsh information off of

Marsh's systems, and the deletion of information off of Marsh's systems, which interfered with Marsh's ability to serve its clients.

39.     The employees have made use of this information at CAC Specialty. Since their departure, many of the clients and contracts that these former employees were responsible for or otherwise worked on have left JLT Specialty USA and Marsh and gone to CAC Specialty. Those employees necessarily have used Marsh's confidential information to do so.

40.     CAC Specialty has also interfered with Marsh's agreements by encouraging and permitting Marsh and JLT Specialty USA employees to violate the non-solicitation provisions of those agreements.

41.     For example, Mr. Rice was formerly JLT Specialty USA's CEO. In that position, he had supervisory authority and responsibility over all of the contracts and client relationships maintained by JLT Specialty USA. Mr. Rice is now CEO of CAC Specialty. Since he has moved to that role, Marsh has received a number of Broker of Record ("BOR") letters, which Marsh receives when a client decides to move its business to a new broker. Those forms indicate that a number of accounts that Mr. Rice was ultimately responsible for are moving to CAC Specialty.

42.     For example, Marsh has received BOR letters from Client A, Client B, Client C, and Client D.[1] Mr. Rice had responsibility for the contracts between these companies and JLT Specialty USA, and with regard to Client A, was directly involved in working on their account and brokering their insurance policies.

43.     Beyond the known violation of his agreement regarding Client A and the other clients identified above, it is impossible for Mr. Rice to perform his duties as CEO for CAC

---

[1] Marsh is using pseudonyms to protect the confidentiality of these third-party companies.

Specialty without violating the restrictive covenants his employment Agreement, which prohibit him from soliciting or servicing any of the same clients that he serviced at JLT Specialty USA through February 28, 2021, and given that other CAC Specialty employees are, on information and belief, pursuing some of those accounts. CAC Specialty has been informed of these ongoing violations of Mr. Rice's employment agreement, and has refused to take any corrective action.

44.     Further, CAC Specialty admitted to Marsh that by May 2019, its discussions and recruitment of Mr. Rice had proceeded so far that CAC Specialty and Mr. Rice were talking to third parties about their venture, despite that Mr. Rice was still employed by JLT Specialty USA. Specifically, CAC Specialty's chairman, Paul Sparks, spoke with Marsh employee Patrick Donnelly at the annual CIAB conference in Colorado Springs in October 2019. After dinner one evening, Mr. Sparks mentioned a third party who went to high school with both Mr. Rice and Mr. Donnelly, and whom Mr. Sparks also knew. Mr. Sparks said he had run into the third party in the spring of 2019 and said, "He [the third party] couldn't believe I was starting this thing with Mike [Rice]." Mr. Donnelly responded and asked when exactly Mr. Sparks had seen and spoken to the third party. Sparks answered, "In May." Upon giving his answer, Mr. Spark went pale, bent over at the waist, said, "Oh s***," and asked, "Am I on the record?"

45.     Mr. Sparks also admitted under oath in the McGriff litigation that he had a dinner with Mike Rice and others in "early April" of 2019. One of the topics they discussed at the dinner was "how likely is it that the JLT guys would be attracted to this platform?" Mr. Sparks also admitted that Mr. Rice "was at JLT at the time."

46.     As Chairman of CAC Specialty, Mr. Sparks' statements are attributable to CAC Specialty. His statement to Mr. Donnelly described in Paragraph 44, above, is an admission by

CAC Specialty that its discussions with and recruitment of Mr. Rice had proceeded so far that CAC Specialty and Mr. Rice were talking to third parties about it in May 2019. Moreover, his admission that he and Mr. Rice had dinner "in early April" of 2019, while Mr. Rice was "at JLT," and that one of the purposes of the dinner was to discuss creating a platform that the "JLT guys would be attracted to" goes far beyond preparing to compete. These are clear admissions that Mr. Rice breached his fiduciary duty while employed by JLT Specialty USA, with the support of CAC Specialty. To be sure, a fiduciary can plan to leave and go out on his own and engage in fair competition, but a fiduciary cannot scheme to take his subordinates with him while he is still working at the company.

47.     Indeed, Mr. Rice signed a separation agreement on April 26, 2019 promising to honor his duties to Marsh, including but not limited to his duty of loyalty and contractual duty not to compete against Marsh during his employment.

48.     In light of Mr. Spark's admissions that he was scheming with Mr. Rice to create a platform that would attract JLT Specialty USA's other employees, and in light of Mr. Sparks' recognition that his admission to Mr. Donnelly was meaningful and his overt display of guilt over saying it, considering that Marsh employees actually resigned at or near the same time (May 2019), and considering CAC Specialty hired many JLT Specialty USA employees then hired Mr. Rice, it is reasonable to infer that Mr. Rice was actively involved in identifying which employees to recruit and that he helped CAC Specialty to recruit them. It is also clear that Paul Sparks knew that Mr. Rice was actively breaching his fiduciary obligations to Marsh in April, and unfairly competing against Marsh in May. As mentioned above, Mr. Sparks' admissions are attributable to CAC Specialty since he is its Chairman.

49.     Another former employee of Marsh, Andre Eichenholtz, also entered into restrictive covenants with JLT Specialty Insurance Services Inc. and owes common-law and statutory duties to Marsh. Mr. Eichenholtz resigned in the midst of leading the response to a substantial request for proposal, or RFP, for Client A. Although the RFP process had been underway for over a month before his resignation, Mr. Eichenholtz held the RFP hostage. Specifically, before resigning, Mr. Eichenholtz approached Patrick Donnelly and offered to use his best efforts to land Client A's work *only if* he would be paid his production bonus and only if Marsh agreed to release him from his restrictive covenants. If Marsh did not take his "deal," then, Mr. Eichenholtz told Mr. Donnelly, he would leave anyway and take the business with him.

50.     After resigning, Mr. Eichenholtz made the same demand, but was unwilling to even tell Marsh where he was going.

51.     Client A is, as identified above, one of the clients for whom Mr. Rice had responsibility at JLT Specialty USA and who sent a BOR letter moving a substantial portion of business to CAC Specialty, and it is reasonable to infer, based on Mr. Eichenholtz's threat, that Mr. Eichenholtz is now soliciting that client under the management of Mr. Rice in violation of both Mr. Eichenholtz' restrictive covenants and Mr. Rice's restrictive covenants.

52.     It is also reasonable to infer, based on Mr. Eichenholtz's threat and based on his refusal to identify where he was going to go to work after he resigned, that Mr. Eichenholtz was planning to join CAC Specialty well before he actually resigned and his half-hearted work on the

Client A RFP was part of an intentional scheme to benefit himself and CAC Specialty at Marsh's expense.

53.     It is also reasonable to infer, given that Mr. Rice hid his intentions to join CAC Specialty from at least May until September, and given that Mr. Rice had some responsibility for Client A, that Mr. Rice has been complicit in the threat Mr. Eichenholtz made to Marsh. No inference is necessary to establish that Mr. Eichenholtz is now working under Mr. Rice's management given that Mr. Rice is now CEO of CAC Specialty and that Mr. Rice's knowledge and actions are attributable to CAC Specialty.

54.     CAC Specialty has greatly benefited from the former employees' breaches of their contractual and legal obligations owed to Marsh. CAC Specialty's actions, including: arranging a meeting to allow the former employees to recruit each other in violation of their employment agreements, hiding the fact that Mr. Rice was going to work for CAC Specialty during the exact time frame that CAC Specialty recruited the other employees and the other employees resigned, obtaining BOR letters for restricted clients of JLT Specialty USA to move their business to CAC Specialty, including accounts for which Mr. Rice had responsibility, coupled with Mr. Sparks' admissions and guilty behavior, demonstrates that CAC Specialty has intentionally interfered with these contracts.

55.     To date, Marsh has lost of $2 million because of CAC Specialty's wrongful actions.

## FIRST CLAIM FOR RELIEF
### Misappropriation of Trade Secrets Under The DTSA
### (18 U.S.C. § 1836 *et seq.*)

56.     Marsh incorporates by reference the allegations in Paragraphs 1 through 55 above.

57.     Marsh owns and possesses certain trade secrets as described above, including client and prospective client list and information, and pricing information. This information was created by Marsh (or created by JLT Specialty USA and acquired by Marsh) at significant expense and over the course of many years. This information constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3).

58.     These trade secrets relate to services offered and sold in interstate or foreign commerce.

59.     Marsh's trade secrets are highly valuable and Marsh will suffer significant and irreparable harm from the use and disclosure of this information, including loss of business, loss of competitive advantage, diminution in the value of the trade secrets, and damage to client relationships.

60.     Marsh has taken reasonable steps to protect the secrecy of this information, including by securing its premises and electronic systems, restricting access to its information to certain Marsh employees, who must access the information on Marsh's secured, password-protected systems, and who must sign employment agreements containing confidentiality provisions. JLT Specialty USA took similar steps before it was acquired.

61.     CAC Specialty has misappropriated Marsh's trade secrets by acquiring them from Marsh's and JLT Specialty USA's former employees, whom CAC Specialty knew had obligations to keep that information confidential, and using the trade secrets to unfairly compete against Marsh.

62.     CAC Specialty's scheme to continue acquiring Marsh's trade secrets from Marsh's and JLT Specialty USA's employees is ongoing, and CAC Specialty continues to recruit Marsh's

employees through improper means. CAC Specialty will continue to acquire and exploit Marsh's trade secrets unless enjoined from doing so.

63.     CAC Specialty's misappropriation of Marsh's information has caused and will cause Marsh to suffer substantial injury, including actual damages, lost profits, harm to its reputation, and diminution in the value of its trade secrets. CAC Specialty has also been unjustly enriched by its misappropriation of Marsh's trade secrets.

64.     CAC Specialty's actual or threatened misappropriation of Marsh's trade secrets is intentional, knowing, willful, fraudulent, malicious, and oppressive. CAC Specialty acquired Marsh's trade secrets with the deliberate intent to injure Marsh and enrich themselves. As a result, Marsh is entitled to damages, according to proof at trial, injunctive relief, exemplary damages, and attorney's fees pursuant to the DTSA.

## SECOND CLAIM FOR RELIEF
### Misappropriation of Trade Secrets under the CUTSA
### (Colo. Rev. Stat. § 7-74-101 *et seq.*)

65.     Marsh incorporates by reference the allegations in Paragraphs 1 through 64 above.

66.     Marsh is the owner of the information described above. This information constitutes trade secrets within the meaning of Section 7-74-102(4) of the Colorado Revised Statutes.

67.     Marsh's trade secrets are highly valuable and Marsh will suffer significant and irreparable harm from the use and disclosure of this information, including loss of business, loss of competitive advantage, diminution in the value of the trade secrets, and damage to client relationships.

68.     Marsh has taken reasonable steps to protect the secrecy of this information, including by securing its premises and electronic systems, restricting access to its information to certain Marsh employees, who must access the information on Marsh's secured, password-protected systems, and who must sign employment agreements containing confidentiality provisions. JLT Specialty USA took similar steps before it was acquired.

69.     CAC Specialty has misappropriated Marsh's trade secrets by acquiring them from Marsh's and JLT Specialty USA's former employees, whom CAC Specialty knew had obligations to keep that information confidential, and using the trade secrets to unfairly compete against Marsh.

70.     CAC Specialty's scheme to continue acquiring Marsh's trade secrets from Marsh's and JLT Specialty USA's employees is ongoing, and CAC Specialty continues to recruit Marsh's employees through improper means. CAC Specialty will continue to acquire and exploit Marsh's trade secrets unless enjoined from doing so.

71.     CAC Specialty's misappropriation of Marsh's information has caused and will cause Marsh to suffer substantial injury, including actual damages, lost profits, harm to its reputation, and diminution in the value of its trade secrets. CAC Specialty has also been unjustly enriched by its misappropriation of Marsh's trade secrets. CAC Specialty's actual or threatened misappropriation of Marsh's trade secrets is intentional, knowing, willful, fraudulent, malicious, and oppressive. CAC Specialty acquired Marsh's trade secrets with the deliberate intent to injure Marsh and enrich themselves. As a result, Marsh is entitled to damages, according to proof, injunctive relief, exemplary damages, and attorneys' fees pursuant to the CUTSA.

### THIRD CLAIM FOR RELIEF
### Interference with Contractual Relations

72.     Marsh incorporates by reference the allegations in Paragraphs 1 through 71 above.

73.     Marsh had or acquired contracts with former employees of Marsh and JLT Specialty USA who have departed for CAC Specialty. These contracts contained provisions requiring the employees to maintain the confidentiality of trade secrets and confidential information, provisions requiring the employees to return Marsh's and JLT Specialty USA's information at the end of their employment, provisions prohibiting the solicitation of Marsh's and JLT Specialty USA's employees during the course of employment, and provisions restricting the solicitation of clients and prospective clients.

74.     CAC Specialty knew of these contracts. The knowledge of CAC Specialty's senior executives and its Chairman are attributable to CAC Specialty, and the senior executives of CAC Specialty who were formerly employed by Marsh and JLT Specialty USA's know of their own contracts as well as the contracts of their subordinate employees at CAC Specialty who were also their subordinate employees at Marsh.

75.     As set forth above, CAC Specialty interfered with these contracts by causing Marsh's and JLT Specialty USA's former employees not to perform their contractual obligations and to instead take actions to harm Marsh and benefit CAC Specialty.

76.     As a result of CAC Specialty's actions, Marsh has been deprived of the benefit of its contracts with its former employees (and the contracts it acquired from JLT Specialty USA, and has suffered damages. Further, CAC Specialty has been unjustly enriched by its actions. As a result, Marsh is entitled to damages according to proof.

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Breaches of the Duty of Loyalty and Fiduciary Duties

77.    Marsh incorporates by reference the allegations in Paragraphs 1 through 76 above.

78.    As employees of Marsh and JLT Specialty USA, the employees who left for CAC Specialty, including Mr. Rice and Mr. Eichenholtz, owed Marsh and JLT Specialty USA an undivided duty of loyalty to act with the utmost good faith to and in the best interest of Marsh and JLT Specialty USA. The senior employees owed a fiduciary duty.

79.    Marsh was entitled to place its trust and confidence in these employees, and did rely on their loyalty, integrity, and faithful performance of their job duties and responsibilities.

80.    These employees, including Mr. Rice and Mr. Eichenholtz, breached their duty of loyalty and fiduciary duties, including by soliciting Marsh's and Marsh and JLT Specialty USA's employees to leave for CAC Specialty while still employed by Marsh. These employees knew that such actions were harmful to Marsh and JLT Specialty USA and were for the benefit of CAC Specialty.

81.    These employees, including Mr. Rice and Mr. Eichenholtz, breached their duty of loyalty and fiduciary duties, including by soliciting Marsh's and Marsh and JLT Specialty USA's clients and prospective clients to leave for CAC Specialty. These employees knew that such actions were harmful to Marsh and JLT Specialty USA and were for the benefit of CAC Specialty.

82.    CAC Specialty provided substantial assistance to these employees, including by setting up a meeting so that the employees could encourage each other to leave Marsh and JLT Specialty USA for CAC Specialty while they were still employed by Marsh or JLT Specialty USA, and to bring clients and information with them, and by accepting the benefits of these breaches of duty.

83.     As a result of CAC Specialty's actions, Marsh has been damaged and CAC Specialty has been unjustly enriched. Further, CAC Specialty's actions were intentional willful, knowing, malicious, fraudulent, and oppressive. Accordingly, Marsh is entitled to damages according to proof at trial, as well as punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     That the Court enter a permanent injunction prohibiting CAC Specialty from misappropriating, continuing to misappropriate, or threatening to continue to misappropriate, Marsh's trade secrets;

B.     That the Court enter a permanent injunction prohibiting CAC Specialty from providing services to any current or former Marsh or JLT Specialty USA clients that would result in a breach of Mr. Rice's contractual obligations to Marsh;

C.     That the Court award Marsh compensatory and other monetary damages against CAC Specialty, including the greater of (a) Marsh's lost profits and interest, or (b) CAC Specialty's improperly gained profits, in an amount to be proven at trial, including (without limitation) the cost of litigation against CAC Specialty made necessary by CAC Specialty's wrongful acts;

D.     That the Court award Marsh its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D) and Colorado Revised Statutes §7-74-105;

E.     That the Court award exemplary damages, including pursuant to 18 U.S.C. § 1836(b)(3)(C); and

F.     That the Court award Marsh such other relief as the Court deems appropriate.

Respectfully submitted this 18th day of November, 2019.

*s/ Darren E. Nadel*
Darren E. Nadel
Thomas W. Carroll
Tommy Postek
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Phone: 303-629-6200
Fax: 303-629-0200
Email:  dnadel@littler.com
          tcarroll@littler.com
          tpostek@littler.com

*Attorneys for Plaintiff*

4840-5320-4394.12 059121.1119