## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:19-cv-03266-RM-STV

MARSH USA INC., a Delaware corporation,

Plaintiff,

v.

COBBS ALLEN CAPITAL, LLC, a Delaware limited liability company,

Defendant.

---

## MARSH USA INC.'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

---

Plaintiff Marsh USA Inc. ("Marsh") responds to Defendant Cobbs Allen Capital, LLC's ("CAC," "Cobbs Allen" or "Defendant") Rule 12(b)(6) motion to dismiss [Dkt. 19] as follows.

## I.      INTRODUCTION

Defendant's Motion ignores the facts actually pled in Marsh's Complaint, misstates facts found in the Complaint, and introduces new alleged "facts" not contained within the Complaint. The new facts are not subject to judicial notice. The Motion could and should be denied for that reason alone.

But should the Court forgive Cobbs Allen for adding facts, ignoring facts, failing to honor the inferences to which Marsh is entitled at the pleading stage, and misreading yet other facts, and perform the analysis called for under Rule 8 (i.e., determining whether the actual allegations, as pled, allege a cause of action) it will find that Marsh's Complaint sets forth in a plain, straight-forward manner, how Defendant improperly conducted a scheme to damage Marsh by stealing

Marsh's employees and confidential and trade secret information. CAC did this by encouraging and assisting Marsh's employees in violating their restrictive covenants with Marsh (and, in some cases, with Marsh's predecessor-in-interest for those agreements, JLT Specialty Insurance Services, Inc. ("JLT")).

Besides misappropriating Marsh's trade secrets and confidential information, Cobbs Allen in a very calculated way worked through Marsh/JLT employees who had already transferred their loyalty to CAC, but who were purporting to still work for Marsh/JLT, to solicit employees in violation of those employee's restrictive covenants with Marsh. Rather than respond to these allegations, Defendant contends that it cannot understand the allegations against it or respond meaningfully because the Complaint lacks certain facts. But none of the issues raised by Defendant have merit. All of the facts necessary for Defendant to respond are set forth in the Complaint, and are known to Defendant (or could be easily determined in discovery). Defendant's Motion is nothing more than an effort to avoid explaining—and answering for—their demonstrable improper actions. Accordingly, Defendant's Motion should be denied.

## II.    LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion to dismiss is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "The Court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

To withstand a Rule 12(b)(6) motion, "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All facts pled in the complaint are presumed to be true, and are viewed in the light most favorable to the plaintiff. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Further, the court draws all reasonable factual inferences in favor of the non-moving party. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (citing *Twombly*, 550 U.S. at 544). The complaint need only "plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." *Shero*, 510 F.3d at 1200. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Put another way, the complaint need only give fair notice of what the claim is and the grounds upon which it rests.

## III.    ARGUMENT

### A.    Defendant's Motion Is Based On Improper Allegations Outside The Scope Of The Pleadings And Not Subject To Judicial Notice.

As an initial matter, Defendant's Motion is heavily based on facts not contained within the pleadings and inappropriate for consideration in a motion to dismiss. *See* Motion to Dismiss ("MtD") at pp. 2-4 (making numerous claims, not contained in the Complaint, about Marsh, Marsh's employees and their motivations). Such statements are outside the four corners of the Complaint, and are not contained in any document subject to judicial notice. Accordingly, they are irrelevant to Defendant's Motion and should not be considered. *Mobley*, 40 F.3d 337, 340.

Similarly, Defendant's Motion contains numerous citations to findings contained in the

memorandum order and opinion on the plaintiff's motion for a preliminary injunction in the case of *McGriff Seibels & Williams, Inc. v. Sparks*, No. 2:19-cv-1196-ACA, 2019 WL 4600051 (N.D. Ala., Sept. 23, 2019) (the "*McGriff* opinion"). Importantly, Marsh is not a party to that case and it has, therefore, never had an opportunity to litigate the issues that Cobbs Allen claims have already been determined in the *McGriff* action.  That is why Marsh brought *this* action.

Defendant contends that the findings in the *McGriff* action are subject to judicial notice because they are the "records" of another court on a matter that bears on the disposition of the case at hand. *See* MtD at p. 2, fn. 1. Defendant is incorrect. While the ***existence*** of judicial records is subject to judicial notice, the facts or evidence presented in those records are not subject to judicial notice unless they are, of course, *not subject to reasonable dispute*. *U.S. v. Boyd*, 289 F.3d 1254, 1258 (10th Cir. 2002); *Horton v. Davis*, 2015 WL 7294815, *2 (D. Colo., Nov. 19, 2015) (taking judicial notice of the existence of other judicial filings, but refusing to take judicial notice of the truth of any facts contained in those filings); *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018) (noting that although courts routinely take judicial notice of the existence of actions in other courts, they may take judicial notice of factual findings *only if the facts are not subject to reasonable dispute*).

Here, the factual findings in the *McGriff* opinion are absolutely subject to dispute.  To begin with, Marsh was and is not a party to that action.  Those facts, therefore, are not preclusive in this action. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 328, fn 7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard.")

Moreover, those facts ***remain in dispute*** in the *McGriff* action itself, given that they were

findings made solely for the purpose of determining whether to grant preliminary relief.  Thus, they are not final in any sense, but only what the court finds to be "likely" given the contours of the Rule 65 proceedings that forms the basis for the *McGriff* preliminary injunction ruling.  *Schrier v. University of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (holding that pursuant to Rule 65 a party need only show a substantial likelihood of success to obtain a preliminary injunction.)  It is also currently under appeal with the Eleventh Circuit (Case No. 19-14208.[1] Accordingly, the opinion is not subject to judicial notice, and Defendant's arguments based on "facts" from it should be completely ignored. This creates an insurmountable problem for Cobbs Allen.  It has so thoroughly incorporated those "facts" into its Motion that they cannot be separated back out. The Court should not have to attempt this feat to correct Cobbs Allen's fatal deficiencies even if it were even possible to so with precision.  Instead, the Court should simply deny the motion due to Cobbs Allen's failure to carry its burden of demonstrating that the operative facts –and the inferences that go along with those operative facts—are insufficient to meet the requirements of Rule 8.

**B.     Misappropriation Of Trade Secrets.**

Marsh's claim for misappropriation, as set forth in its Complaint, is very straightforward. Marsh alleges that the employees who left Marsh/JLT for CAC took with them trade secrets belonging to Marsh, including customer and prospective customer lists, and strategy and analysis information related to those customers. *See, e.g.,* Complaint at ¶¶ 17, 38, 51, 61. Defendant ignores these allegation, and takes out-of-context incomplete snippets from the Complaint to make the

---

[1] Marsh's Complaint refers to sworn testimony of certain CAC officers, such as Paul Sparks. *See, e.g.,* Complaint at ¶¶ 45-46. Marsh is not seeking judicial notice of the transcripts of that testimony, but rather offers them as an admission on the part of CAC.

generic argument (supported by equally generic and inapplicable case law) that the Complaint lacks sufficient facts to apprise Defendant of the claims against it. None of Defendant's arguments have merit.

### 1.   The Complaint Sufficiently Pleads Facts Supporting Marsh's Claims For Misappropriation Of Trade Secrets.

#### a.   Marsh Is Not Obligated To, But Certainly Can, Name Names

Defendant appears to contend that Marsh's claim is insufficiently pled because Marsh does not state *who* stole Marsh's trade secrets. MtD at p. 8.  This is false. The Complaint alleges that the employees who departed Marsh/JLT for Defendant took Marsh's trade secrets, and that they did so with Defendant's encouragement and assistance. *See* Complaint ¶¶ 30 (alleging that CAC encouraged and assisted the departing employees in taking Marsh's trade secrets), 37 (alleging that Defendant permitted these employees to bring Marsh's confidential and trade secret information with them to Defendant), 60-61 (alleging that Defendant misappropriated Marsh's trade secrets by acquiring them from Marsh's former employees), 69-70 (same).

While it is true that the names of these employees are not all listed in the Complaint, there is no requirement that they must be.  Marsh wished to avoid publicly naming each of these individuals, as this is a dispute primarily between Marsh and Cobbs Allen, but *Marsh certainly can provide those names if needed.*

That said, Cobbs Allen seems unable to point to any case law to support its argument that Rule 8 requires the naming of names. Rather, as Defendant admits, the purpose of a complaint is merely to give the defendant fair notice of the claims against it. MtD at p. 8 (citing *Tennille v. Western Union Co.*, 751 F. Supp. 2d 1168, 1170 (D. Colo. 2010) [*denying* motion to dismiss conversion claims]).

6

What is more, Defendant is well-aware of the identities of these individuals who stole Marsh's trade secrets. They *employ* those individuals.   Indeed, the Complaint alleges that Defendant specifically targeted these individuals, in part because of their knowledge of Marsh's trade secret information. Complaint at ¶ 30 (alleging that CAC engaged in a "systematic campaign to organize a mass exodus of employees from Marsh to CAC.")

Notably, Cobbs Allen's made-for-litigation assertion that it doesn't know the identities of the individuals is patently inconsistent with what Cobbs Allen's lawyers said when counsel were engaged in discussions before Marsh filed suit.  Specifically, when Marsh raised with Defendant its concerns that these employees had stolen Marsh's trade secrets prior to filing this Complaint, Defendant responded that *it had investigated the matter* and *instructed these specific employees to comply with their obligations to Marsh/JLT*, and was satisfied that no misconduct had occurred. Ex. 1 (October 14, 2019 Letter from Cobbs Allen's counsel.)  Perhaps this is a matter of Cobbs Allen's out-of-state counsel not speaking with Cobbs Allen's Colorado counsel who investigated the matter, and who was able to represent that he spoke to the right people such that he was satisfied that no wrongdoing occurred. Cobbs Allen cannot now claim it has no idea who Marsh is referring to after apparently understanding the issue well enough to speak with them while conducting the so-called investigation prior to the Complaint being filed.

### b.    Marsh Has Sufficiently Identified Trade Secrets

Defendant also contends that the trade secrets themselves are not identified. MtD at p. 8. Again, this ignores the actual pleadings in the Complaint. Marsh identifies, as trade secrets, its client and prospective client information, consisting of "contact information and confidential and proprietary strategies and analysis regarding decision makers at those clients/prospective clients."

Complaint at ¶ 17. Marsh also identified as trade secrets information about the unique insurance contracts negotiated by JLT Specialty. *Id.* at ¶ 18. Specifically, the Complaint noted that these contracts incorporated information about the "clients' businesses, the customers' preferences, and the insurers' willingness to structure insurance policies that match the clients' needs[,]" as well as information about the clients' preferences and aversions to specific contract structures. *Id.*

It is well-established that both customer/prospective customer lists and business strategies and analysis can constitute trade secrets. *See, e.g., Hertz v. Luzenac Group*, 576 F. 3d 1103, 1113-14 (10th Cir. 2009) ("Colorado recognizes that a customer list can be a trade secret under the UTSA…..we read the broad language of the UTSA as including both actual and prospective customer lists, since both can be of value to the owner."); *Executive Consulting Group, LLC v. Baggot*, 2018 WL 1942762, *7-8 (D. Colo., April 25, 2018) (finding that client lists, customer contact lists, and customer information are protectable trade secrets); *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 901-03 (Colo. App. 1990) (trade secret protection exists for customer information, compiled by the employer, which provides the employer with "a significant business advantage"); *R & D Bus. Sys. v. Xerox Corp.*, 152 F.R.D. 195, 197 (D. Colo. 1993) (party's "parts and supplies sources, research and development efforts, market strategy, and customer lists" constituted trade secrets under Colorado law); *Xantrex Tech., Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, *18 (D. Colo. 2008) ("Detailed customer information is a trade secret."); *Mattern & Assocs., L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 266 (D. Del. 2010) (customer contact list, client proposals, requests for proposal, client requirements, and various items associated with employer's business methods qualified for trade secret protection under Delaware Uniform Trade Secrets Act).

8

Marsh's Complaint also establishes that this information is a trade secret.  In the Tenth Circuit, courts use a six factor test to determine whether or not information constitutes a trade secret:  (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the **trade secret** to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (**6**) the amount of time and expense it would take for others to acquire and duplicate the information.  *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003)

Here, the Complaint establishes that Marsh's customer/prospective customer lists and business strategies and analysis constitute trade secrets.  The Complaint alleges that this information was developed at Marsh and is not known outside of Marsh.  Complaint at ¶¶ 21-22. It further details Marsh's efforts to keep the information secret, including through the use of confidentiality agreements for its employees and by storing the information on password protected systems.  *Id.* at ¶¶ 22-29.  The Complaint also details why this information is valuable to Marsh and how Marsh would be damaged if it were known to its competitors. *Id.*  at ¶¶ 24, 59, 67.  Finally, the Complaint alleges that the information was created by Marsh at significant expense and over the course of many years.  *Id.* at ¶ 57. Accordingly, the Complaint pleads the existence of trade secrets.

### c.     Marsh Has Sufficiently Alleged Intentional Misappropriation

Cobbs Allen next argues that Marsh fails to sufficiently allege a scheme to take Marsh's trade secrets. MtD at p. 8. Again, not so. While it is true, at this preliminary stage, Marsh does not

know all the details of Defendant's scheme to acquire Marsh's trade secrets (to be sure, that is what discovery is for), the Complaint sets forth specific facts showing Defendant's misappropriation. The Complaint first details how Defendant conducted the scheme to steal Marsh's employees and the information they possessed, including:

- CAC's pattern and practice of conducting such schemes against its competitors, including against McGriff Seibels & Williams, Inc. (Complaint at ¶ 31);

- CAC's admission that it arranged a meeting between then JLT employees and McGriff employees in June 2019, the purposes of which was for these employees *to solicit each other* (in violation of their contractual obligations to Marsh) and facilitate their transfer to CAC (Complaint ¶¶ 32-34);

- CAC had already recruited, and was using former JLT employees to solicit Marsh employees, in early April 2019  (Complaint ¶¶ 44-45);

- For example, CAC had apparently recruited former Marsh employee Andre Eichenholtz, and was working with him to undermine Marsh *prior to his departure from Marsh*, (Complaint ¶¶ 49-54).

These facts show that Defendant was not merely engaged in the normal recruiting of employees. It was engaged in a detailed plan to damage Marsh and steal Marsh's business by taking key employees and information. Because of the unique nature of JLT's customers and their needs, the employees and information were both crucial components for Defendant to steal that business for themselves. The scheme was directed by Defendant, and the departing employees were in close contact with and acting in concert with each other, and with Defendant, at all relevant times.

After setting forth this important context, the Complaint details the specific facts showing

Defendant's misappropriation of Marsh's information. Specifically, the Complaint alleges that a forensic inspection of the departing employees' electronic devices showed that many of the employees engaged in similar patterns of taking electronically stored information, including the apparent transfer of critical Marsh information onto USB storage devices, coupled with the deletion of information from Marsh's systems to cover their tracks. Complaint at ¶ 38.

In other words, these employees were taking information from Marsh that would assist them in stealing Marsh's clients, and then trying to cover their tracks by attempting to delete the evidence of their downloading of electronically stored information.  Many of the employees (who were in close contact with each other) resigned at the same time or within mere days of each other, and had planned these departures to inflict maximum damage to Marsh's business. *Id.* at ¶ 35.

This, coupled with setting up a meeting for the now former Marsh employees to recruit each other, at a minimum, creates the inference that Defendant was directing the efforts to steal Marsh's information and that the former Marsh employees were acting in concert with each other on Cobbs Allen's behalf.  The Complaint details that these employees actually have used Marsh's information to steal Marsh's clients, as shown in part by their rapid acquisition of Marsh's clients, even though these clients had highly specific requirements and preferences *given the unique nature of each insurance contract in the specialty insurance industry. Id.* at ¶ 39. Accordingly, Marsh has sufficiently pled that Defendant planned, directed, and executed the plan to steal Marsh's trade secrets, including by directing Marsh's employees to steal that information from Marsh's systems.

### 2. Marsh's Complaint Alleges Specific Facts Showing That Defendant Took And Used Marsh's Information.

Defendant contends that Marsh is asking this Court to adopt a theory of "strict liability" for trade secret claims. MtD at pp. 9-10. It is unclear how Defendant arrived at this theory because

the Complaint contains no such argument. The term "strict liability" does not appear anywhere in the Complaint. As set forth above, Marsh's claim is based on specific facts showing that CAC was working in concert with Marsh/JLT employees for many months and assisting those employees to take Marsh's information and breach their contractual relationships with Marsh. Those employees then, in a coordinated manner designed to inflict maximum harm to Marsh, left Marsh for CAC, and forensic evidence shows that they took Marsh's information with them on the way out. That is not "strict liability."

Defendant alternatively argues that Marsh is pursuing a theory of inevitable disclosure, which, according to Defendant, is prohibited under Colorado and federal law. MtD at pp. 10-11. Neither statement is correct.

Defendant cites no case law for the proposition that claims for inevitable disclosure are barred under the DTSA. Rather, Defendant refers to Section 1836(b)(3)(A)(i)(I) of the DTSA. However, Section 1836(b)(3)(A)(i)(I) contains no such prohibition. That section lists one of the circumstances under which a plaintiff can seek an injunction under the DTSA. It provides that a plaintiff can obtain an injunction to prohibit actual or threatened misappropriation, but that to the extent the injunction places conditions on the employment of a person, the injunction shall be based on evidence of threatened misappropriation and "not merely on the information the person knows." *Id.* In other words, the section merely limits the terms of an injunction that may be awarded when a plaintiff *succeeds* on a claim for misappropriation *or threatened misappropriation*. It has nothing to do with the pleading standards or evidentiary requirements for proving misappropriation or threatened misappropriation. Notably, no similar language is used with regard to any other remedies available under the DTSA. Thus, if the DTSA was meant to bar

the inevitable disclosure doctrine, it would have created a clear rule prohibiting inevitable disclosure with respect to all forms of relief available under the DTSA.

Thus, contrary to Defendant's contention, courts have *approved* claims under the DTSA based on a theory of inevitable disclosure. For example, in *Molon Motor and Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531 (N.D. Ill., May 11, 2017), defendant moved to dismiss plaintiff's claim for misappropriation under the DTSA specifically on the grounds that the claim was based on a theory of inevitable disclosure. The court rejected the argument and denied the motion to dismiss, noting that, plaintiff alleged that the defendant went to work for a competitor in a similar capacity as he had worked for plaintiff and had connected a thumb drive to his computer before terminating his employment with plaintiff, *which was sufficient to allege misappropriation under the DTSA. Id.* at * 5-6. Accordingly, even if Marsh were pursuing a theory of inevitable disclosure, such claims are permissible under the DTSA.  To be sure, the key allegations that were found sufficient in *Molon Motor* are only *a portion of* the allegations Marsh has made here: work in a similar capacity plus downloading of electronically stored information.

The result is similar under Colorado law. Defendant claims that "No Colorado court has ever allowed a claim for inevitable disclosure of trade secrets." MtD at p. 10. What Defendants omit is that Colorado courts have not rejected a theory of inevitable disclosure either, and instead have suggested that it is permissible. Even in the cases cited by Defendant, the court declined to reach the issue. *See Xantrex Tech. Inc. v. Adv. Energy, Inc.*, 2008 WL 2185882, *19 (D. Colo., May 23, 2008) ("I find that it is unnecessary for me to determine whether or not the Colorado legislature intended to recognize the inevitable disclosure doctrine. It is clear that the Colorado legislature intended to recognize something less than actual misappropriation of a trade secret as

appropriate for injunctive relief within the framework of the statute.")

In any event, Marsh's allegations go beyond merely alleging inevitable disclosure. Rather, as set forth above, Marsh has set forth specific facts to show that: (1) Defendant encouraged and facilitated Marsh/JLT employees to take information; (2) that the employees actually did take Marsh's information (as shown, in part, through forensic evidence); and (3) that Defendant is now using that information.

Notably, the Complaint establishes that a key part of Defendant's scheme was to target specific Marsh/JLT employees with knowledge of unique, complex insurance arrangements with specific customers, and with knowledge of the specific preferences and aversions of these customers. Complaint at ¶ 18. The information about those customer relationships, including the strategy and analysis related to those customers, is a Marsh trade secret. *Id.* at ¶¶ 20-22. Defendant targeted Marsh's employees, and then worked closely with them as they executed a coordinated departure from Marsh. The forensic evidence shows that these employees took Marsh trade secret information related to these customers with them before leaving for CAC. *Id.* at ¶ 38. The fact that many of these employees employed similar patterns of misconduct with their computers shows that they were doing so in a coordinated fashion, at the direction of Defendant. Further, the fact that Defendant has actually acquired so many of these customers in such a short period of time further shows that Defendant is using the trade secrets it acquired from Marsh. Starting from scratch, Defendant never could have acquired these customers so quickly (nor even known to pursue them in the first place, or how to pursue them).

Accordingly, Marsh's Complaint is not limited to a theory of inevitable disclosure. But even if the Court were to determine that Marsh's claims are limited to a theory of inevitable

disclosure, such claims are not prohibited under either the DTSA or UTSA.

**C.     The Complaint Properly Alleges Tortious Interference With Contract**

As with the rest of its motion, Defendant ignores the actual content of Marsh's Complaint in moving to dismiss Marsh's claim for tortious interference with contract.

**a.     Marsh Sufficiently Identified The Contractual Provisions That Were Interfered With**

Defendant contends that Marsh has not identified any contract provision that was interfered with. It is as though Cobbs Allen drafted the motion without actually reading the Complaint. The Complaint alleges that the employees who left JLT/Marsh for CAC had agreements with Marsh/JLT containing "non-disclosure provisions" which prohibited them from "using or disclosing trade-secret and other confidential information except for legitimate business reasons" and which required them to "return all confidential company information in their possession at the end of their employment."[2] Complaint at ¶ 25.

The Complaint further identifies contractual provisions which "prohibit them from improperly recruiting certain employees and soliciting or servicing certain clients." *Id.* The Complaint identifies "separation agreements" affirming those obligations when their employment ended. *Id.* at ¶ ¶ 26, 47.

The Complaint also alleges that Marsh "had or acquired contracts with former employees of Marsh and JLT Specialty USA who have departed for CAC Specialty. These contracts contained provisions requiring the employees to maintain the confidentiality of trade secrets and confidential information, provisions requiring the employees to return Marsh's and JLT Specialty USA's information at the end of their employment, provisions prohibiting the solicitation of Marsh's and

---

[2] Defendant again contends it does not know who these individuals are, but that is nonsense. They are **employed by Defendant**, and Marsh identifies them as former employees who were specifically targeted by CAC for months.  And Cobbs Allen has admitted under oath to setting up the meeting in Denver to have them recruit each other.

JLT Specialty USA's employees during the course of their employment, and provisions restricting the solicitation of clients and prospective clients." *Id.* at ¶ 73. Further, the Complaint alleges that CAC knew of these contracts. *Id* at ¶ 74.

Accordingly, the Complaint identifies the contracts and the specific provisions of those contracts at issue. The actual contracts can, of course, be filed with the Court if the Court requires the naming of names.  But there is simply no requirement that they be attached to the Complaint in order to satisfy Rule 8, because Rule 8 is about making allegations, not about attaching proof.

Defendant's citation to *Cunningham Lindsey U.S. Inc. v. Crawford & Company*, 2018 WL 6307865 (D. Colo., Dec. 3, 2018) is not on point. The plaintiff in Cunningham merely cited to a wide array of various contracts with various, unidentified customers, and generally alleged that the defendant interfered with them. Here, however, Marsh has pointed to specific provisions (protecting disclosure or misuse of information and prohibiting solicitation of coworkers) that were interfered with.

### b.     Marsh Sufficiently Alleged Interference With The Provisions It Identified

Defendant alleges that the Complaint does not allege any interference with the above-identified contractual provisions. MtD at pp. 15-16. Specifically, Defendant contends that the Complaint does not identify any "wrongful means" employed by Defendant to interfere with these contracts. *Id.* Once again Defendant ignores the actual allegations in the Complaint.

Contrary to Defendant's argument, "wrongful means" covers a broad range of conduct. While wrongful means includes, as Defendant notes, "physical violence, fraud, civil suits, and criminal prosecutions" (MtD at p. 16), it is not limited to those categories of misconduct. Rather, the term "wrongful," "includes any conduct that is itself capable of forming the basis of liability for the actor." *Energex Enterprises, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1285-86 (D. Colo. 2003) ("Numerous courts have also recognized that a competitor's interference with

another's prospective business relations through independently actionable conduct such as misappropriation of trade secrets or breach of a confidentiality agreement between the parties constitutes "wrongful conduct" defeating the competitor's privilege.")

Defendant's citation once again to *Cunningham Lindsey*, 2018 WL 6307865 is not on point. In *Lindsey*, the plaintiff merely alleged, in a vague and conclusory fashion, that the defendant had encouraged the plaintiff's employees to resign and plaintiff's customers to switch their business to defendant. Here, by contrast, Defendant engaged in independently wrongful conduct, including misappropriation of Marsh's trade secrets (as set forth above) and by aiding and abetting the departing employees in breaching their fiduciary duties to Marsh (as set forth below). Defendant took affirmative steps to assist the departing employees in breaching their non-solicitation provisions, including by arranging a meeting for these employees to solicit each other (in violation of their contracts). Complaint at ¶ 32. Defendant also took direct action, through current and former Marsh employees to solicit Marsh's employees in violation of their contractual and fiduciary duties to Marsh. *Id.* at ¶¶ 41-53, 78-80.

**D.    The Complaint Properly States a Claim for Aiding and Abetting a Breach of Fiduciary Duties.**

Finally, Defendant closes its eyes to the allegations in Marsh's Complaint supporting Marsh's claim for aiding and abetting breaches of loyalty and fiduciary duty.

### a.    The Identities Of The Employees Redux

Defendant repeats its argument that it does not know who breached their duties to Marsh, claiming that "Marsh includes no identifying information or allegations as to who these people are[.]" MtD at p. 17. This, again, is false. The Complaint states, "As employees of Marsh and JLT Specialty, the employees who left for CAC Specialty, including Mr. Rice and Mr. Eichenholtz, owed Marsh and JLT Specialty USA an undivided duty of loyalty to act with the utmost good faith

and in the best interest of Marsh and JLT Specialty USA. The senior employees owed a fiduciary duty." Complaint at ¶ 78. Two of these individuals are specified by name, and the rest are *employed* by Defendant. As set forth in the Complaint, Defendant specifically targeted these individuals and was coordinating with them during the relevant period. Defendant knows who these individuals are, and even if it does not it could easily discern their identity. Defendant has fair notice of the claims against it, and cannot bury its head in the sand to manufacture a pleading defect.

Next, unable to deny that at least two of the individuals at issue were identified by name (gutting the argument that they do not know any of the individuals' identities), Defendant tries to eliminate those individuals from consideration by arguing that the "allegations against Messrs Rice and Eichenholtz will be tested in arbitration." MtD at p. 17. However, as even Defendant acknowledges (in the very next paragraph), Marsh's claims are against *CAC*, not Messrs Rice and Eichenholtz. Marsh's claims against CAC are not subject to arbitration. Whether or not separate claims against those individuals would be subject to arbitration is irrelevant.

### b.    Marsh Has Sufficiently Alleged That Defendant Was A Knowing Participant

Defendant is also incorrect in contending that Marsh has not set forth facts showing that Defendant was a "knowing participant" in a breach of fiduciary duty. MtD at p. 18 (citing *Alvarez LLC v. Blazar Tech. Solutions, LLC*, 2019 WL 3505952, *2 (D. Colo., July 16, 2019), which *denied* defendant's motion for summary judgment on plaintiff's breach of fiduciary duty claim, and noted that knowledge of wrongdoing can be inferred through circumstantial evidence). Defendant contends that the only allegation made by Marsh on this point is that Defendant "hosted a meeting involving JLT employees and employees of another insurance broker (McGriff, Seibels & Williams) where there was supposedly discussion about employees of both companies joining

CAC Specialty." MtD at p. 18.

This is wrong in two respects. It is an incorrect characterization of Marsh's pleadings, which (based on a sworn admission from Defendant in the *McGriff* lawsuit) alleges that this meeting was not just hosted, but *arranged by* Defendant, that the attendees' airfare and lodging were paid by Defendant, *and that the purpose of this meeting was for these employees to solicit each other to join Defendant*, which is exactly what happened. Complaint, ¶¶ 32-34.[3] Hosting a meeting which has the purpose of having employees solicit each other while still employees of Marsh sufficiently alleges that Cobbs Allen was a knowing participant in the employees unlawful solicitation of each other.

But beyond that, the Complaint also alleges that the Cobbs Allen executives met to discuss designing a "platform" that would be attractive to Marsh's employees *while one of the Cobbs Allen executives was still working for Marsh.* Complaint at ¶¶ 45-46.  The Complaint also alleges that

---

[3] Defendant also contends that it cannot be held responsible for these actions because it did not exist at the time. It makes this claim by referring to a finding in the *McGriff* order, which as set forth above is not subject to judicial notice, and therefore inappropriate for consideration. *Horton*, 2015 WL 7294815, at *2.  Further, that order does not state when CAC became a legal entity.  The Complaint alleges that CAC was indeed in operation in May 2019, such that it had already recruited Mr. Rice and that Defendant and Mr. Rice were speaking openly of their business to third parties. Complaint, ¶ 46.

 It is odd that Defendant's argument suggests that Mr. Denson and/or Paul Sparks should be personally liable for those actions since they apparently were not acting on behalf of Cobbs Allen.  If that is the case, Marsh can certainly amend its Complaint to make Sparks and Denson Defendants in their individual capacities if they were not acting on behalf of a corporate entity.

But while those individuals may apparently, according to Cobbs Allen, be personally liable for their conduct, Defendant's argument is only properly suited to a motion for summary judgment. Neither the Complaint nor the articles of incorporation relied on by Cobbs Allen establish that Cobbs Allen was not in existence at the time individuals like Sparks and Denson were engaging in the misconduct described in the Complaint.

Defendant admitted that it was actively discussing Mr. Rice's transfer to Defendant in April 2019, and that by May 2019, Defendant and Mr. Rice were already talking to third parties about their venture, even though Mr. Rice was still a JLT employee at the time. *Id.* at ¶¶ 44-45. These admissions, made by Defendant's chairman Paul Sparks, establish that Mr. Rice had already transferred his loyalty to Defendant and that Defendant was using Mr. Rice's position of influence within JLT to solicit employees and business, in violation of Mr. Rice's duties to JLT. *Id.* at ¶¶ 46-48. Mr. Spark's reactions after he accidentally revealed this information show that Defendant knew what it was doing was wrong, and needed to be kept secret from JLT. *Id.* at ¶ 44 (alleging that Mr. Sparks, after accidentally revealing that Mr. Rice's involvement with Defendant stretched back to May 2019, went pale, doubled-over, and stated, "Oh s***…Am I on the record?")

In addition to those allegations, the Complaint also alleges that the departing employees solicited Marsh's and JLT's clients and prospective clients to leave for CAC, and that they did so in coordination with Defendant. Complaint, ¶¶ 41-54, 81-82. The Complaint sets forth in detail how Mr. Rice has been violating his restrictive covenants with Marsh by servicing the same clients he serviced at Marsh (whose names are listed in the Complaint as pseudonyms, to protect their confidentiality, but which will be disclosed during discovery pursuant to a protective order), and that Defendant has refused to take any corrective action about these ongoing breaches. *Id.* at ¶¶ 41-43. In this regard, the duty of loyalty extends beyond the termination of one's employment. Restatement (3rd) of Agency § 8.05.  Thus, while certain aspects of the duty of loyalty end at the termination of employment, the duty not to compete unlawfully through use or disclosure of the former employer's confidential information continues beyond the conclusion of employment.  *Id.*

Separately, with regard to Mr. Eichenholtz, the Complaint alleges in detail how Mr.

Eichenholtz held Marsh's customer relationships hostage as he attempted to negotiate his exit from Marsh. *Id.* at ¶¶ 49-52. Specifically, he offered to try to retain a client's business for Marsh, but only if Marsh agreed to release him from his restrictive covenants (among other terms). Notably, the customer Mr. Eichenholtz discussed with Marsh is one of the clients for whom Mr. Rice had a relationship, and who subsequently left Marsh for Defendant. *Id.* It is a reasonable inference from these facts that Mr. Eichenholtz, and Mr. Rice (who had by this time already transferred his loyalty to Defendant without informing JLT that he had done so) were working together in making the threat to Marsh, and subsequently leading the business away from Marsh and to Defendant. *Id.* at ¶¶ 52-53. This scheme culminated and the customer left Marsh for Defendant when both Mr. Eichenholtz and Mr. Rice were working for Defendant, and it is reasonable to infer, in light of the other facts discussed above, that the scheme (and the decision to retain the benefit of this illicit scheme) were undertaken with Defendant's knowledge and approval. *Id.* at ¶ 53.

Accordingly, the Complaint sets forth numerous ways in which Defendant aided and abetted in breaches of the duty of loyalty and fiduciary duty.

## IV.    CONCLUSION

By adding facts that are not subject to judicial notice, ignoring the lion's share of the allegations actually found in the Complaint, and selectively taking only portions of allegations and then reading them out of context, Cobbs Allen fails to carry its burden of establishing that the Complaint fails to satisfy Rule 8.  The Court should not do that work for Cobbs Allen.

But should the Court undertake that exhaustive work anyway, it will find that the Complaint sets forth specific facts that put Defendant on notice of the claims against it. Accordingly, Defendant's Motion should be denied.

Finally, should the court determine that any allegations are missing, or should the court want the naming of names or the attaching of contracts, Marsh can easily do so through a simple amendment.

Respectfully submitted this 14th day of February, 2020.

*s/ Darren E. Nadel*
Darren E. Nadel
Thomas W. Carroll
Tommy Postek
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO  80202
Phone: 303-629-6200
Fax: 303-629-0200
Email:  dnadel@littler.com
          tcarroll@littler.com
          tpostek@littler.com

Derek S. Hecht
LITTLER MENDELSON, P.C.
2050 Main Street, Suite 900
Irvine, CA  92614
Phone: 949-705-3000
Fax: 949-724-1201
Email:  dhecht@littler.com

*Attorneys for Plaintiff Marsh USA Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of February, 2020, a true and correct copy of the

foregoing **MARSH USA INC.'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)** was filed and served

via CM/ECF, which will send notice to the following:

Howard M. Kaplan
Mark William Premo-Hopkins
Michael Slade
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Phone: 312-862-3807
Fax: 312-862-2200
Email: howard.kaplan@kirkland.com
       mark.premohopkins@kirkland.com
       mslade@kirkland.com

Nicholas William Dowd
William M. Ojile, Jr.
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Phone: 303-575-4003
Fax: 720-200-0679
Email: ndowd@armstrongteasdale.com
       bojile@armstrongteasdale.com

*Attorneys for Defendant*

                                        *s/ Elisabeth L. Egan*
                                        Elisabeth L. Egan

4811-5108-0625.5 059121.1119